UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

--------------------------------------------------------x

AMBAC ASSURANCE CORPORATION,

      Plaintiff,

    -v-                              No. 3:24-CV-01443-LTS

THE BANK OF NEW YORK MELLON,

      Defendant.

--------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

      Plaintiff Ambac Assurance Corporation ("Ambac") brings this action, seeking to recover damages against Defendant Bank of New York Mellon ("BNYM") for BNYM's alleged "grossly negligent breach" of its contractual and common-law duties as trustee for certain bonds, insured by Ambac, that were issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA").  (Docket Entry No. 31 ("Second Amended Complaint" or "SAC").)  BNYM moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the SAC for failure to state a claim on which relief may be granted.  (Docket Entry No. 36 (the "Motion to Dismiss").)  The Court has subject matter jurisdiction of this action pursuant to 48 U.S.C. section 2166(a)(2) because this proceeding is related to the case commenced on behalf of COFINA under Title III of Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  See 48 U.S.C.A. § 2166(a)(2) (Westlaw through P.L. 118-6) ("The district courts shall have . . . original but not exclusive jurisdiction of all civil proceedings arising under this subchapter [Title III], or

arising in or related to cases under this subchapter.").[1]  The COFINA confirmation order included the release of Ambac's relevant breach of duty claims against BYNM other than those premised on claims of gross negligence, willful misconduct, or intentional fraud.  (See Docket Entry No. 561-1 in Case No. 17-3284 ("Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation" or "COFINA Confirmation Order") § 1.151.)  Defendants argue that Ambac's amended complaint is fails to state gross negligence claims upon which relief may be granted and must, accordingly, be dismissed.

The Court has reviewed thoroughly the parties' submissions in connection with the Motion to Dismiss.  For the following reasons, the Motion to Dismiss is granted in its entirety.

## BACKGROUND

The following recitation of material facts is drawn from the Second Amended Complaint, the well-pleaded factual allegations of which are taken as true for purposes of this motion practice, and from documents integral to the Second Amended Complaint or subject to judicial notice.

### The COFINA Structure and the Resolution

In 2006, the Legislative Assembly of the Commonwealth of Puerto Rico ("Puerto Rico" or the "Commonwealth") passed legislation to improve Puerto Rico's access to capital markets by creating a new "securitization structure."  (SAC ¶¶ 18-19.)  Under this scheme, Puerto Rico imposed a new sales-and-use tax (the "SUT") and created an entity, which would eventually become COFINA, that was designated as the owner of a portion of revenue generated

---

[1]    This case, which was commenced in the Southern District of New York in 2017, was transferred to this District pursuant to 48 U.S.C. § 2166(d).  (Docket Entry No. 54.)

by the SUT (the "Dedicated SUT Revenues").  (Id. ¶ 19.)  In 2007, Puerto Rico enacted Act 56, which "officially created COFINA and authorized COFINA to issue bonds backed by the Dedicated SUT Revenues."  (Id.)  Under Act 56, the Dedicated SUT Revenues were expressly separated from Puerto Rico's general funds to ensure that revenue designated as owned by COFINA would not be diverted to Puerto Rico's treasury.  (Id. ¶ 20.)  "Act 56 specifies that the Dedicated SUT Revenues 'shall not constitute available resources of the Commonwealth of Puerto Rico.'"  (Id. ¶ 21.)  Because of the legal structures segregating the Dedicated SUT Revenues from Puerto Rico's then-troubled general treasury, bonds issued by COFINA (the "COFINA Bonds") received strong initial ratings from ratings agencies.  (Id. ¶¶ 23-24.)

In 2007 and 2009, COFINA issued Puerto Rico Sales Tax Revenue Bonds (the "COFINA Bonds"), backed by the Dedicated SUT Revenues.  (Id. ¶¶ 21-22.)  Pursuant to an indenture agreement (the "Resolution"), COFINA issued four types of debt: senior cash pay bonds (the "Senior Cash Pay Bonds"), which were entitled to periodic interest payments; senior capital interest bonds (the "Senior CAB Bonds"), which received no cash payments prior to maturity or acceleration; subordinate cash pay bonds (the "Subordinate Cash Pay Bonds"), which were entitled to periodic interest payments and had shorter maturity dates than the senior capital interest bonds; and subordinate capital appreciation bonds (the "Subordinate CAB Bonds"), which received no cash payments prior to maturity or acceleration, and had shorter maturity dates than the senior capital appreciation bonds.  (Id. ¶ 36.)  All of the subordinated bonds (the "Subordinated Bonds") were subordinate to all of the senior bonds (the "Senior Bonds").  Ambac provided financial guaranty insurance for over $800 million dollars in gross face amount of Senior CAB Bonds.  (Id. ¶ 3.)  BNYM served as trustee for all of the COFINA bonds issued

under the Resolution.  (See generally SAC; see also Docket Entry No. 39 ("Def. Mem.") at 1 ("BNY Mellon served as the trustee for all COFINA Bonds issued under the Resolution.").)

Certain provisions of the Resolution, which set forth "the terms governing all COFINA Bonds; and (ii) the rights of and protections for the holders and insurers of the COFINA Bonds" (SAC ¶ 26), are of particular relevance to the instant litigation.  Section 201 of the Resolution provides that "there is hereby created by the Resolution . . . a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to this Resolution."  (See Docket Entry No. 38-10 (the "Resolution") § 201.)  The "Pledged Property" referred to therein is defined by the Resolution to include, inter alia, the Dedicated SUT Revenues.  (Id.)

In furtherance of the pledge, the Resolution imposed certain obligations on COFINA and the Commonwealth.  (SAC ¶ 27.)  Section 705 of the Resolution ("Section 705") obliged COFINA to "defend, preserve, and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries, and the Bondowners . . . against all claims and demands of all persons whomsoever."  (Id.; see also Resolution § 705.)  Section 101, in relevant part, defines "Beneficiaries" to mean registered owners of outstanding bonds and insurers of the bonds.  (See definitions of "Beneficiary," "Bondowner," "Credit Facility Provider," and "Owner," in Resolution § 101.[2])  Section 706 of the Resolution ("Section 706") provides that the Commonwealth shall not "limit or restrict . . . the rights of [COFINA] to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired."  (Id.; see also Resolution § 706.)  Under the terms of the

---

[2]    The Resolution uses once, but does not define, the term "Bondholders," which is used generally in this opinion and the parties' submissions to mean persons or entities holding interests in COFINA bonds.

Resolution, "a failure to observe, or refusal to comply with, the terms of the Resolution or the Bonds" (a "Covenant Breach"), constituted an Event of Default ("EOD"), provided that said "failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to [COFINA] by the Trustee [BNYM] or any Beneficiary[.]" (Resolution § 1101(1)(ii); see also SAC ¶ 27.)

       If an EOD occurred, certain contractual powers and obligations accrued to the trustee under the Resolution (the "Trustee"). (SAC ¶ 37.) The Resolution provides that an EOD activates a post-default waterfall provision specifying that Senior Bondholders are paid "first until full funding or payment thereof," while holders of Subordinate Bonds are not paid until Senior Bondholders have been repaid in full. (Id.; see also Resolution § 1103.) Under this provision, "Senior Bondholders are entitled to pari passu treatment on all amounts due and owing, while Subordinate Bondholders receive payment only after the Senior Bonds are repaid in full." (SAC ¶ 37.) This constitutes a significant departure from the bondholders' rights under non-default circumstances, in which BNYM, as the Trustee, is required to treat all COFINA Bonds as having "equal rank without preference, priority, or distinction of any of the Bonds . . . over any other thereof[.]" (Resolution § 103.) After an EOD, BNYM was also permitted to accelerate the principal and accrued interest of the COFINA Bonds and, upon written request of the owners of at least twenty-five percent in principal of the outstanding bonds, was required to do so. (SAC ¶ 38; see also Resolution § 1102(1).) However, BNYM could not accelerate bonds insured by Ambac without Ambac's prior consent, (see Docket Entry No. 38-2 (the "First Supplemental Resolution") at Exhibit B), and BNYM's right to accelerate was predicated on the occurrence of an EOD. In the event of an EOD, BNYM was obligated to "give to the

Bondowners and the Beneficiaries notice . . . within ninety days after actual knowledge . . . of the occurrence thereof[.]"  (Resolution § 1110.)

Section 802 of the Resolution details, and limits, the obligations of the Trustee, providing in pertinent part that:

> The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Resolution, and no implied covenants or obligations shall be read into this Resolution against the Trustee. . . . The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it.  The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Resolution at the request or direction of any of the Owners pursuant to this Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.  The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty.

(Resolution § 802.)

Alleged Events of Default

In 2014, the condition of Puerto Rico's finances deteriorated, leading to passage of the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, which permitted some of the Commonwealth's instrumentalities to reduce or defer payments on outstanding bonds.  (SAC ¶ 50.)  Although COFINA Bonds were excluded from the Act, ratings agencies downgraded the COFINA Bonds in response to the legislation and downgraded them four additional times by July 2015.  (Id. ¶¶ 52-56.)  Plaintiff alleges that, in the years following, seven distinct events (the "Events") took place that constituted EODs under the terms of the Resolution.

### Event One

On September 9, 2015, the Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "Working Group"), a Commonwealth-appointed body, published the Puerto Rico Fiscal Economic Growth Plan (the "2015 Fiscal Plan" or "Event One").  (Id. ¶ 59.)  Ambac asserts that the 2015 Fiscal Plan "portrayed COFINA's assets and debt obligations as those of the Commonwealth, in direct contravention of the foundational premise of the COFINA structure." (Id.)  Page 19 of the 2015 Fiscal Plan includes a table of projected revenues and debt obligations, in which COFINA's revenue and debt are included in the tables projecting the Commonwealth's future revenues and debt service obligations in the years 2015-2020.  (Docket Entry No. 38-12 (the "2015 Fiscal Plan") at 19, 33.)  In response to the 2015 Fiscal Plan, counsel for certain Bondholders wrote a letter — shared with BNYM — to COFINA, arguing that the Plan "inexplicably, and inappropriately, treats COFINA debt and revenues as that of the Commonwealth" and that statements within the Plan were inconsistent with Sections 501 and 201 of the Resolution.  (Docket Entry No. 38-15 (the "September 2015 Bondholder Letter"); see also SAC ¶ 63.)

### Event Two

Second, on February 1, 2016, the Working Group published a "Puerto Rico Restructuring Proposal" (the "2016 Restructuring Proposal" or "Event Two").  (SAC ¶ 70.)  The 2016 Restructuring Proposal "referred to COFINA debt as the debt of the Commonwealth and included COFINA debt service and revenue within the Commonwealth's own debt service and revenue calculations."  (Id.)  One week later, Bondholders wrote a letter advising COFINA and BNYM of their assertion that the Restructuring Proposal's characterization of the COFINA Bonds was a breach of the Resolution's terms, and that failure to take steps to remedy these

"failures within thirty (30) days will constitute an Event of Default pursuant to section 1101(1)(ii)." (Docket Entry No. 38-28 (the "February 2016 Bondholder Letter") at 2; <u>see also</u> SAC ¶¶ 71-72.)

    <u>Event Three</u>

    Third, on April 6, 2016, the Commonwealth enacted the Moratorium Act ("Event Three"), which "empowered the Governor, by executive order, to 'declare any government entity to be in a state of emergency" and, "if the executive order so provides, no payment on a covered obligation of such . . . government entity shall be made." (SAC ¶ 74 (quoting Docket Entry No. 38-17 ("Moratorium Act") § 201(a)).) The Moratorium Act also barred exercise "of any right of acceleration or termination . . . related to any covered obligation" of a government entity "during the emergency period for that entity," if such acceleration or termination arose from monetary or non-monetary default. (SAC ¶ 75; <u>see also</u> Moratorium Act § 201(b)(ii).) Further, under Section 201(d) of the Moratorium Act, certain debt service obligations could be suspended or modified "[i]f ordered by the Governor during the emergency period . . . ." (SAC ¶ 76, <u>see also</u> Moratorium Act § 201(d).) The Act, which took immediate effect, included COFINA as a government entity amenable to the terms of the statute. (SAC ¶ 77.)

    Ambac does not allege that the Commonwealth ever issued an executive order declaring COFINA to be in a state of emergency, such that it was covered by the Moratorium Act's restrictions. (<u>See</u> <u>generally</u> SAC ¶¶ 74-82.) On the day of the Moratorium Act's passage, counsel for certain Bondholders sent a letter to COFINA and BNYM, asserting that "an Event of Default has occurred under section 1101 of the Resolution" due to the passage of the Moratorium Act. (Docket Entry No. 38-18 (the "April 2016 Bondholder Letter").) Specifically, counsel for those Bondholders suggested that the Moratorium Act "constitute[d] an anticipatory breach of

section 1101(1)(i) of the Resolution . . . because the Moratorium Act permits the Governor to bar COFINA from making principal or interest payments" and constituted a breach of "section 1101(1)(ii) of the Resolution because [it] restricts the rights of [bondowners] to exercise [the] remedies" of acceleration otherwise permitted under the Resolution.  (Id. at 2.)

Event Four

Fourth, holders of general obligation bonds (the "GO Bonds") issued by the Commonwealth (the "GO Bondholders") brought two separate actions against the Commonwealth, seeking relief for unpaid debt obligations: one on June 21, 2016, in the Southern District of New York (the "Jacana Lawsuit") and one on July 20, 2016, in the District of Puerto Rico (the "Lex Claims Litigation" and, with the Jacana Lawsuit, the "GO Bonds Litigation") ("Event Four").  (SAC ¶¶ 84, 89.)  In the Jacana Lawsuit, the GO Bondholders alleged that the Dedicated SUT Revenues were "available resources" which could be used to satisfy outstanding debt relating to the GO Bonds.  (SAC ¶ 85.)  Although the Jacana Lawsuit was stayed just nine days after it was filed, due to the enactment of PROMESA (see Notice of Automatic Stay, ECF No. 32, Jacana Holdings I LLC, et al. v. Commonwealth of Puerto Rico et al., No. 16-CV-4702-GHW (S.D.N.Y. July 19, 2016); see also Docket Entry No. 38-33), Ambac asserts that "COFINA failed to take any steps to defend against those challenges" asserted in the Jacana Lawsuit.  (SAC ¶ 86.)  In the Lex Claims Litigation, COFINA was added as a Defendant, and COFINA filed a timely response seeking "judgment . . . dismissing all claims made against the COFINA Defendants."  See COFINA Defs.' Answer and Affirmative Defenses to Pls. Second Am. Compl., ECF No. 164, Lex Claims, LLC, et al. v. Alejandro Garcia Padilla, et al., No. 3:16-CV-2374-FAB (D.P.R. Dec. 16, 2016)  The district court allowed the Lex Claims

Litigation to proceed despite PROMESA's enactment, but the ruling was overturned in connection with an appeal filed by another party.  (SAC ¶¶ 90-91.)

Event Five

Fifth, on March 17, 2017, the Puerto Rico Fiscal Agency and Financial Advisory Authority (known by its Spanish acronym, "AAFAF") submitted a joint fiscal plan for the Commonwealth and COFINA (the "2017 Fiscal Plan" or "Event Five") to the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), a federally appointed body created under PROMESA and charged with overseeing Puerto Rico's return to fiscal solvency.  (SAC ¶ 94; see also id. ¶ 11 n.3.)  The Oversight Board certified the 2017 Fiscal Plan that same day, making the plan "binding on the Commonwealth and COFINA as a matter of federal law under PROMESA."  (Id.)  The 2017 Fiscal Plan "commingled COFINA's revenues, including the Dedicated SUT Revenues, with the Commonwealth's assets and liabilities," and allotted for debt service a total estimated cash flow insufficient to satisfy COFINA's liabilities for seven of the nine subsequent years.  (Id. ¶¶ 95-96.)  On March 31, 2017, counsel for certain Bondholders wrote to BNYM protesting various aspects of the 2017 Fiscal Plan and asserting that, in relation to it, the Commonwealth and COFINA had breached their obligations under Sections 705 and 706 of the Resolution.  (Id. ¶¶ 97-98; see also Docket Entry No. 38-27 at 40.) The letter demanded that BNYM "immediately issue notices of default to COFINA for the violations of Sections 705 and 706 of the Resolution . . . [and] refrain from making payments on account of the COFINA Notes."  (SAC ¶ 98; see also Docket Entry No. 38-27 at 43.)  BNYM did not respond to the demand.

Ambac asserts that the 2015 Fiscal Plan, 2016 Restructuring Proposal, 2016 Moratorium Act, GO Bondholder Litigation, and 2017 Fiscal Plan each constituted breaches of

the Resolution which, upon COFINA's failure to remedy such breaches within thirty days of notice, ripened into EODs that BNYM failed to declare or otherwise respond to.  (SAC ¶¶ 67, 73, 82, 93, 99.)

Event Six

Sixth, on April 28, 2017, AAFAF published a proposed plan of adjustment for the Commonwealth's debt under Title VI of PROMESA (the "Title VI Proposal" or "Event Six"). (SAC ¶ 106.)  Ambac asserts that the Title VI Proposal "violated the COFINA structure" in two ways.  First, the Title VI Proposal recommended that all Dedicated SUT Revenues be pooled into Puerto Rico's general treasury, rather than segregated for the purpose of repaying the COFINA Bonds.  For repayment, GO Bonds would have priority over COFINA Bonds.  (Id. ¶ 107.)  Second, the Proposal sought to offer Senior Bondholders "a choice of treatment" with two options.  Under the first option, if COFINA Bondholders consented to the plan of adjustment, they would receive a pro rata share of $6.9 billion worth of newly issued Senior Bonds, with Senior and Subordinate bondholders "to be treated pari passu."  (Docket Entry No. 38-21 (the "Title VI Proposal") at 4; see also SAC ¶ 109.)  If the COFINA Bondholders rejected the plan of adjustment, Senior Bondholders would receive $450 million worth of short-term notes, and Subordinate Bondholders would receive nothing.  (Title VI Proposal at 4; see also SAC ¶ 109.)

Event Seven

Seventh, on April 29, 2017, the Commonwealth enacted House Bill 938, entitled the "Law on Compliance with the Fiscal Plan" (the "Compliance Law" or "Event Seven"). (SAC ¶ 102.)  This law "diverted COFINA's revenues to the [general treasury]" and put them under the control of the Secretary of the Treasury, who was authorized to use them

"occasionally, only as the last resort."  (Id. ¶ 103; see also Compliance Law §§ 4.01, 4.03.)

Under section 4.01 of the Compliance Law, COFINA, along with other "public corporations"

and "instrumentalities," was directed to immediately "transfer" any "surplus" of revenue to the

Department of Treasury, for which these funds would be "available resources."  (Compliance

Law § 4.01.)

On May 1, 2017, the first business day following the enactment of the

Compliance Law, Ambac wrote to COFINA and AAFAF, asserting that the Compliance Law

constituted "an unequivocal breach of the pledges of the Commonwealth contained in . . .

Section 706 of the Resolution[,] and that "COFINA's silence in the face of this legislation . . .

constitutes a breach of COFINA's duty, under Section 705 of the Resolution, to defend, preserve,

and protect the pledge of property[.]"  (See Docket Entry No. 38-24 (the "May 1 Ambac Letter")

at 3-4.)  The May 1 Ambac Letter also notified COFINA of Ambac's view that the Title VI

Proposal "constitute[d] a further repudiation of the COFINA structure" that constituted a

"declaration of war on COFINA and its property."  (Id. at 5.)  In the letter, Ambac stated that it

was providing notice under Section 1101 that the Compliance Law and Title VI Proposal

constituted "incurable breaches of the Resolution" that "constitute[d] Events of Default under

Section 1101.1(ii)."  (Id.)

That same day, BNYM took its first action responsive to the above-mentioned

events, notifying COFINA and AAFAF in writing that the Compliance Law's provisions

constituted a "claim to the Pledged Property" that "undermine[d] the pledge of the Pledged

Property to the Trustee."  (See Docket Entry No. 38-23 (the "May 1 BNYM Letter") at 2; see

also SAC ¶ 114.)  In the letter, BNYM demanded that COFINA detail, by May 3, "the actions

that COFINA will take to defend, preserve, and protect the pledge of the Pledged Property

against the Commonwealth's claim to the Pledged Property under the Act and any effort by the

Governor to utilize the Pledged Property pursuant to the Act."  (May 1 BNYM Letter at 1.)

When COFINA failed to respond, BNYM sent a second letter (Docket Entry No. 38-25 (the

"May 4 BNYM Letter")) notifying COFINA that the Compliance Law's enactment, and

COFINA's failure to defend against it, constituted breaches of Sections 705 and 706, which

would ripen into Events of Default "if they are not remedied within 30 days of the date of

Ambac's default notice [the May 1 Ambac Letter]."  (May 4 BNYM Letter at 3; see also SAC

¶ 115.)  On May 5, 2017, the Oversight Board commenced a PROMESA Title III proceeding on

COFINA's behalf, resulting in an automatic stay of any collection actions by creditors, including

holders of the Senior Bonds, and the default notice cure period.  (SAC ¶¶ 116, 131.)

> In the months leading up to the initiation of Title III proceedings, certain holders
of the Senior Bonds had pushed BNYM to take aggressive steps to protect Senior Bondholders'
ability to collect on their investment.  In January 2017, "a significant Senior Bondholder"
demanded that BNYM refrain from distributing future monthly cash payments to holders of Cash
Pay Bonds, based on "the many Events of Default and the continuing attacks by the
Commonwealth and others on COFINA and its viability."  (Id. ¶ 117.)  That same bondholder
sent a letter on January 31, 2017, demanding that BNYM withhold payments to Cash Pay
Bondholders "until the Commonwealth and COFINA commit to defend the COFINA structure
against all challenges."  (Id. ¶ 119.)

> Ambac sent a letter the next day, arguing that disbursement of funds to Cash Pay
Bondholders would "favor cash pay bonds (including subordinate cash pay bonds) over senior
capital appreciation bonds."  (Id. ¶ 120.)  Ambac sent another letter on April 30, 2017,
"instructing BNYM" to "cease making payments, including the payment scheduled for the next

day . . . to holders of Subordinate Bonds until the Senior Bonds were paid in full." (<u>Id.</u> ¶ 121.) On May 4, 2017, counsel for certain Bondholders wrote to BNYM, demanding that BNYM declare an immediate Event of Default on the basis "that the noticed defaults were incurable," and "immediately accelerate all COFINA Notes," an instruction also delivered in a separate letter by "Ambac and a number of Senior Bondholders owning more than 25% of the principal amount of outstanding Senior Bonds." (<u>Id.</u> ¶¶ 124-25.) BNYM did not declare a covenant breach, withhold payments to holders of Subordinate Bonds, accelerate the Senior Bonds or take any action in response to these events until the enactment of the Compliance Law. (<u>See</u> <u>generally</u> SAC.) Nor did it declare an "incurable breach" in response to the Compliance Law and use that declaration to immediately accelerate payment of the COFINA Bonds. (<u>Id.</u> ¶ 130.)

Ambac asserts that these decisions damaged Senior Bondholders, and therefore Ambac, because, "[i]f BNYM had declared an Event of Default and accelerated the Senior Bonds in a timely fashion, Senior Bondholders would have received 100 cents on the dollar." (<u>Id.</u> ¶ 135.) Ambac also asserts that BNYM's conduct was rooted in "egregious conflicts of interest that prevented it from properly carrying out its duties and responsibilities to Senior Bondholders and Ambac," including "a commercial interest in retaining good relations with the Commonwealth" and its instrumentalities, as well as "with Subordinate Bondholders, who included major financial corporations." (<u>Id.</u> ¶ 143; <u>see</u> <u>also</u> <u>id.</u> ¶¶ 44-48.) Ambac contends that the structure of the COFINA Bonds — under which, should the bonds become distressed, interests of the CAB and Cash Pay Bondholder classes could become antagonistic — also presented "an obvious risk of divided loyalties" against which BNYM failed to take appropriate action. (<u>Id.</u> ¶¶ 41-43, 58.)

Ambac filed the complaint in this action on May 2, 2017.  (Id. ¶ 145.)  Litigation was stayed on June 19, 2017 (Docket Entry No. 12 ("Stay Order")) pursuant to a May 30, 2017, order by the United States District Court of Puerto Rico staying proceedings in this action due to the commencement of Title III proceedings.  (Id. ("Pursuant to the May 30, 2017, Order of the United States District Court for the District of Puerto Rico . . . this case is stayed pending further order of the Court.").)  On February 5, 2019, COFINA's Title III Plan of Adjustment was confirmed.  See COFINA Confirmation Order.  Under COFINA's Title III Plan, most claims pertaining to COFINA were released, including most claims between Ambac and BNYM relating to BNYM's service as Trustee, but Section 1.151 provided that the release did not encompass "[c]laims or [c]auses of [a]ction for gross negligence, willful misconduct, or intentional fraud asserted, or that could have been asserted, whether sounding in contract or tort, against BNYM by Ambac" in the instant case.  Id. § 1.151.  Following vacatur of the order staying this case, Ambac filed the Second Amended Complaint, of which BNYM currently seeks dismissal.

DISCUSSION

Standard of Review

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), and "allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  In deciding a Rule 12(b)(6) motion to dismiss, the Court must "draw all reasonable inferences in [plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011)

(internal quotation marks omitted).  "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies."  ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014) (citation omitted).  In assessing the sufficiency of the Second Amended Complaint, the Court has, accordingly, considered the content of the documents referenced therein, including, inter alia, the Resolution, correspondence between COFINA bondholders and COFINA and/or BNYM, and the content of the 2015 Fiscal Plan, 2016 Restructuring Proposal, 2016 Moratorium Act, GO Bondholder Litigation, 2017 Fiscal Plan, the Title VI Proposal, and the Compliance Law.

Gross Negligence Standard

        In compliance with the "Released Claims" clause of COFINA's Title III plan, Ambac pursues claims for gross negligence only, alleging that BNYM was grossly negligent in violating duties owed to Ambac under the Resolution and common law.[3]  To prevail on a claim for gross negligence under New York law, a plaintiff must establish the elements of ordinary negligence, namely "(1) a duty owed by the defendant to the plaintiff[;] (2) a breach thereof [;] and (3) injury proximately resulting therefrom."  M+J Savitt, Inc. v. Savitt, No. 08-CV-8535-DLC, 2009 WL 691278, at *12 (S.D.N.Y. Mar. 17, 2009) (quotation marks and citation omitted).  Beyond the ordinary negligence elements, a plaintiff must also "allege[] facts plausibly

---

[3]    Under the terms of the Resolution, BNYM's duties are governed by New York law.  (See Resolution § 1211 (providing that, while the Resolution shall be "governed by, and construed and enforced in accordance with, the laws of the Commonwealth[,]" "the rights, duties, privileges and immunities of the Trustee . . . shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located," which is New York).)

suggesting that the defendant's conduct evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC, 692 F.3d 42, 61 (2d Cir. 2012) (quotation marks and citation omitted). "Recklessness in the context of a gross negligence claim means an extreme departure from the standards of ordinary care, such that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. at 61-62 (quotation marks and citation omitted). "Gross negligence differs in kind, not only in degree, from claims of ordinary negligence[.]" In re Part 60 Put-Back Litig., 36 N.Y.3d 342, 352 (2020). "A claim of gross negligence requires a plaintiff to prove that the defendant failed to exercise even slight care, scant care, or slight diligence, or that the defendant's actions evinced a reckless disregard for the rights of others." Baidu, Inc. v. Register.com, Inc., 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (denying motion to dismiss gross negligence claim against security company that allegedly processed email address change despite incorrect security question response, failed to check, and therefore detect, wrong security code response, and provided intruder with owner's username, enabling diversion of web site traffic).

For this reason, under New York law, "a mistake or series of mistakes alone, without a showing of recklessness, is insufficient for a finding of gross negligence." Travelers Indem. Co. of Conn. v. Losco Grp., Inc., 204 F. Supp. 2d 639, 644-45 (S.D.N.Y. 2002) (citation omitted). Generally, merely failing to perform a duty owed to another does not constitute gross negligence — more must be alleged. See Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998) ("[T]he act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care."). "By contrast [to ordinary negligence], a triable issue of 'gross

negligence' is not typically found absent more outrageous acts of folly[.]"  Hartford Ins. Co. v. Holmes Prot. Grp., 250 A.D.2d 526, 528 (N.Y. App. Div. 1998).

The standard is demanding and, when sophisticated parties are involved, is more stringent still.  "[I]n a contract between sophisticated parties, . . . New York applies a more exacting standard of gross negligence than it would in other contexts."  Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA, Nat Ass'n v. DB Structured Prods., Inc., 5 F. Supp. 3d 543, 556 (S.D.N.Y. 2014) (quotation omitted); see also Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd., 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013) (explaining that allegations suggesting "Morgan Stanley may have engaged in conduct . . . that was self-serving and aimed at maximizing profits" and that "could be deemed commercially unreasonable" were insufficient to plead gross negligence).

When a gross negligence claim is adequately pled, the allegations must generally be egregious.  In House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A., No. 13-CV-519-RJS, 2014 WL 1383703, at *10 (S.D.N.Y. Mar. 31, 2014), plaintiff stated a claim for gross negligence where defendant allegedly "concealed [] improper investments by reporting them under two fabricated categories, neither of which [was] mentioned in the" agreements governing the contract.  Id. at *10.  The allegations, the court continued, "support[ed] the inference that [defendant] acted with gross negligence because they suggest that [defendant] knew that it should not have invested in [certain assets] and invented this deceptive reporting scheme to conceal the true nature of these investments."  Id.  In Qube Films Ltd. v. Padell, No. 13-CV-8405-AN, 2016 WL 881128, at *5 (S.D.N.Y. Mar. 1, 2016), the court denied defendants' motion for summary judgment as to gross negligence where an escrow agent was accused of "disbursing money to parties other than party designated in the Amended Deal Sheet, personally

appropriating $120,000, continuing to withdraw funds after written notice that further

withdrawals were not authorized, and failing to respond to Plaintiffs' repeated inquiries[.]"  Id. at

*5.  In Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Management, gross negligence

was found to have been alleged adequately where "the defendant added [entities] to the

[portfolio] at spreads that were substantially below the then-prevailing market spreads," because

"Defendant's conduct in these regards may plausibly be said to have been an extreme departure

from the ordinary standard of care, most obviously because there is no apparent reason why

defendant would want to take this risk" and it was "contrary to how defendant explicitly

represented it would manage the portfolio."  692 F.3d at 62-63.  "[G]ross negligence requires a

reckless disregard for the rights of others, bordering on intentional wrongdoing."  Horwitz v.

Camelot Assocs. Corp., 66 A.D.3d 1299, 1302 (N.Y. App. Div., 3d Dep't, 2009) (quotation

marks and citation omitted).[4]

---

[4]    Two New York cases, brought against security providers, are also illustrative of the
difference between ordinary negligence and gross negligence.  In Hartford Ins. Co., for
example, New York's Appellate Division, First Department, granted defendant's motion
for summary judgment as to gross negligence, where the defendant security provider
twice failed to respond to a burglary within a reasonable amount of time, allowing the
burglars to escape.  250 A.D.2d at 528.  By contrast, the First Department denied
defendant's motion for summary judgment as to gross negligence in another case, where
the defendant gave out the keys and then provided the security code for a store's alarm
system over the phone at 4:00 a.m. to a burglar who gave a false name.  See Green v.
Holmes Prot. of N.Y., Inc., 216 A.D.2d 178, 179 (N.Y. App. Div., 1st Dep't, 1995); see
also D'Amico v. Waste Mgmt. of N.Y. LLC, No. 6:18-CV-06080-EAW, 2019 WL
1332575, at *8-9 (W.D.N.Y. Mar. 25, 2019) (finding that plaintiff had stated a claim for
negligence, but not gross negligence, where defendant waste management company
failed to properly maintain a waste collection system, resulting in release of odorous
emissions onto property of class members "on occasions too numerous to recount
individually"); see also Kinsey v. Cendant Corp., No. 04-CV-0582-RWS, 2004 WL
2591946, at *18 (S.D.N.Y. Nov. 16, 2004) (ruling, on a motion to dismiss, that
allegations that defendants "made representations to [plaintiff] regarding the exercise
period for his stock options and then completely contradicted those representations
almost two years later" may support a claim for ordinary negligence, but does not support
a claim for gross negligence).

Ambac contends that BNYM, through grossly negligent conduct, breached four separate sets of duties owed to Ambac and, in doing so, caused Ambac harm.  (See SAC ¶¶ 148-67.)  Its claims are premised on alleged breaches of: the terms of the Resolution (Count One); common-law duties owed by an indenture trustee to beneficiaries prior to an EOD (Count Two); common-law duties owed by an indenture trustee to beneficiaries after an EOD (Count Three); and the implied covenant of good faith and fair dealing.  (Id.)  The Court considers each Count in turn.

Count One - Contractual Duties[5]

Ambac contends that BNYM, through gross negligence, breached duties it owed Ambac under the Resolution by failing to: (i) provide notice of EODs to beneficiaries; (ii) recognize and declare EODs as they occurred; (iii) withhold payments to holders of Subordinate Cash Pay Bonds; and (iv) accelerate the Senior Bonds.  (SAC ¶ 153.)  Specifically, Ambac argues that, after Events One through Five, BNYM should have declared a breach of the Resolution that ripened into an EOD, but did not; that after Event Six, BNYM should have declared an incurable breach, but did not declare a breach at all; and that, after Event Seven, BNYM should immediately have declared an incurable breach (which would, in Ambac's view,

---

[5]     In its initial briefing, BNYM argued that Count One and Count Four should be dismissed on the basis that New York law "does not recognize grossly negligent contract claims." (Def. Mem. at 47-48.)  However, as noted by Plaintiff, New York's Court of Appeals has recognized claims for grossly negligent breach of duties arising in contract, see Abacus Fed. Savs. Bank v. ADT Sec. Servs., Inc., 18 N.Y.3d 675, 681-82 (2012) (finding that plaintiff had stated a claim for grossly negligent breach of contractual duties where "defendants violated their contractual obligations by installing woefully inadequate security systems"); (see also Docket Entry No. 42 ("Pl. Mem.") at 43).  Defendant abandoned this argument on reply, so the Court need not consider it here.  See, e.g., In re Gen. Motors LLC Ignition Switch Litig., 477 F. Supp. 3d 170, 179 n.2 (S.D.N.Y. 2020) ("[Movant] does not press the point in its reply, however, and thus it is deemed abandoned.") (collecting cases).

have allowed the declaration of an immediate EOD prior to COFINA's filing under Title III of
PROMESA).  According to Ambac, because BNYM refused to declare the Events to be covenant
breaches, and then EODs (and did not declare Event Seven to be an immediate EOD), it tied its
own hands, and thus caused its own failure to take the remedial action Ambac believes the
Senior Bondholders were entitled to have it take (and which it could only take, under the
Resolution, subsequent to an EOD): namely, notice of EODs to beneficiaries, acceleration of the
COFINA Bonds, and withholding of payments to Cash Pay Bondholders, which would have
preserved what resources COFINA did have for prioritized repayment of Senior CAB
Bondholders.

        The declaration of a non-monetary EOD under Section 1101(1)(ii) has three
predicate requirements: (i) a breach of the Resolution's terms; (ii) "written notice, specifying
such failure and requesting that it be remedied, [] given to [COFINA] by the Trustee or any
Beneficiary"; and (iii) failure by COFINA or the Commonwealth to cure the noticed breaches of
the Resolution within thirty days.  As to each Event other than the 2015 Fiscal Plan, Ambac
alleges that beneficiaries submitted the notice to COFINA in accordance with the Resolution and
that neither COFINA nor the Commonwealth took any curative action in response such that
BNYM should have taken actions consistent with actual defaults.[6]  The parties' briefing focuses
principally on whether the actions taken by COFINA and the Commonwealth in fact constituted

---

[6]      BNYM argues extensively that the entities other than Ambac that served notices were not
registered owners as required under the Resolution, and that Ambac in one instance did
not notify COFINA itself as required.  (See Docket Entry No. 45 ("Reply") at 5-6.)
BNYM's position appears facially consistent with the language of the resolution, (see
Resolution §§ 305, 1101.1(ii)), but the Court need not reach this issue.  Because the
Court finds that Ambac fails to plead adequately that BNYM acted with gross negligence,
the Court does not reach the question of whether there was in fact proper notice or
whether such notice identified actual breaches that ripened into EODs when they went
uncured.

breaches of the Resolution, either curable (as to Events One through Five) or incurable (as to Events Six and Seven).

Ambac argues that dismissal is unwarranted at this stage because it has plausibly alleged that breaches of the Resolution took place, or that whether a breach took place is a factual dispute that is inappropriate for resolution at this stage in the litigation.  (See Pl. Mem. at 19 ("The Complaint thus clearly alleges that the [2015 Fiscal Plan] and [2016] [R]estructuring [P]roposal were breaches of the bond covenants.  At worst, Ambac's claims turn on disputes over the interpretation of those covenants that cannot be resolved on a motion to dismiss."); id. at 22 ("[COFINA's] paltry efforts [against the GO Bondholder Litigation] came nowhere close to the 'defense' that Section 705 envisions.  At a minimum, those are factual issues that cannot be resolved at this stage."); id. at 35 ("Whether [COFINA] has repudiated a contract so as to waive any cure period [for the purpose of declaring an incurable breach]" "cannot be resolved on a motion to dismiss.").)

The question before the Court, however, is not whether Ambac has plausibly alleged that the Events constituted breaches of the Resolution, such that BNYM should have declared them Events of Default and then exercised the post-EOD powers available to it under the Resolution.  Rather, the Court must determine whether, viewing the allegations in the Second Amended Complaint in the light most favorable to Ambac, BNYM's determination that no covenant breach had taken place (as to Events One through Six) and that the Compliance Law was not an incurable breach (Event Seven), could plausibly constitute gross negligence of the duties it owed to Ambac under the Resolution.  The Court concludes that it could not.

As to the 2015 Fiscal Plan and 2016 Restructuring Proposal, Ambac argues that BNYM applied an "artificially narrow construction of the terms 'claim' and 'demand' that

ignore that broad language of Section 705," in failing to declare these Events to be breaches of the Resolution.  (Pl. Mem. at 41.)  Ambac argues that BNYM should have applied a broader interpretation of the Resolution's text, positing that the Resolution should have been read as requiring that COFINA "defend against 'all claims and demands of all persons whomsoever'" — not merely certain types of claims such as current demands for payment."  (Pl. Mem. at 18 (emphasis in original).)  Because it failed to apply this broader interpretation, Ambac argues, BNYM failed to declare an EOD when it should have, and consequently, could not (and did not) accelerate the COFINA bonds, cease payments to Subordinate Cash Pay Bondholders, or give notice of the alleged EOD to trust beneficiaries prior to COFINA's Title III filing.  (SAC ¶ 73.)

These allegations, taken as true, fall well short of providing plausible support for a finding of gross negligence, even if BNYM drew incorrect conclusions about the interpretation of the resolution.  BNYM's failure to apply Ambac's preferred interpretation of the Resolution, and subsequent failure to take action available to it only after an EOD, cannot plausibly be considered an "outrageous act of folly" or an act smacking of "intentional wrongdoing."  Cases in which pleadings or factual proffers have been found sufficient to support claims for grossly negligent breaches of duty, including cases relied upon by Ambac, involve conduct far more clearly and deliberately transgressive of the defendant's obligations.  For example, in Qube, an escrow agent appropriated, for personal use, funds belonging to a beneficiary, 2016 WL 881128, at *5; in Bayerische Landesbank, a portfolio manager subjected clients' assets to unnecessary risk for no apparent reason, in a manner directly contrary to its alleged representations as to its intended course of conduct, and notifying portfolio holders, 692 F.3d at 61.  The issue Ambac frames here is a dispute over legal interpretation in which reasonable parties could disagree. Even if BNYM's interpretation of the Resolution was actually incorrect, it is not so far divorced

from the text of the Resolution to render plausible a claim for gross negligence.  "A mistake or series of mistakes alone, without a showing of recklessness, is insufficient for a finding of gross negligence."  <u>Travelers</u>, 204 F. Supp. 2d at 644-45, <u>supra</u> at 17.  Even crediting Ambac's interpretation of the Resolution's text, its allegations do not plausibly imply that BNYM's omission was of "an aggravated character as distinguished from the failure to exercise ordinary care."  <u>See</u> <u>Curley</u>, 153 F.3d at 13; <u>supra</u> at 17.

Ambac's gross negligence claims as to BNYM's response to the Moratorium Act, GO Bondholder Litigation, and 2017 Fiscal Plan fail for the same reason — although Ambac raises colorable arguments as to the correct interpretation of the Resolution, BNYM's failure to reach Ambac's conclusions does not approach the sort of egregious misconduct that constitutes gross negligence.  Indeed, Ambac acknowledges that BNYM's refusal to declare a covenant breach following enactment of the Moratorium Act "rests on the same artificially narrow construction of the Resolution [as its response to the 2015 Fiscal Plan and 2016 Restructuring Proposal]."  (Pl. Mem. at 21.)  As to the GO Bondholder Litigation, Ambac argues that "[w]hether COFINA meaningfully 'defended' against the two bondholder suits [and therefore whether BNYM was correct in deeming COFINA's defense non-violative of Section 705] is a fact question that can only be resolved on a full record."  (<u>Id.</u>)  The question, whether factual or legal, is not material to the sufficiency of the SAC, which points to no conduct rising to the level of gross negligence on the part of BNYM.  As to the 2017 Fiscal Plan, Ambac urges rejection of BNYM's argument that the Plan, and COFINA's failure to defend against it, did not constitute a breach of the Resolution because the Plan was "not self-operative" and therefore could not constitute a "claim" or "demand" on the Pledged Property.  Again, while Ambac may be correct that BNYM's interpretation of Sections 705 and 706 of the Resolution, in each of these cases,

was at least arguably too narrow, it alleges no aggravating conduct that could plausibly elevate its claim of negligence to a showing of gross negligence.

The Resolution did not compel BNYM to agree with Bondholders' interpretations of the covenants therein in deciding whether, and to what extent, to declare EODs. Furthermore, to the extent Ambac argues that various notices sent to COFINA or the FOMB by Bondholders who were not record owners of the bonds in which they held beneficial interests, BNYM's reliance on the plain text of the Resolution in determining whether an entity was a Beneficiary empowered to give notice of defaults within the meaning of the notice provision and whether notice was directed to proper parties cannot plausibly support Ambac's claim of gross negligence.

Nor does Ambac sufficiently plead gross negligence as to BNYM's response to the Compliance Law, because Ambac again fails to plausibly allege conduct that constitutes an extreme departure from the ordinary standard of care. BNYM, as Ambac acknowledges, promptly sent a letter to COFINA demanding remedial action and, upon COFINA's failure to respond, sent notice that an EOD would ripen within thirty days of the May 1, 2017 (the date of the May 1 Ambac Letter). The fact that BNYM declined to circumvent the notice-and-cure period mandated under Section 1101(1)(ii) and declare the Compliance Law and Title VI Proposal to be incurable breaches, a concept not incorporated into the plain text of the Resolution, cannot plausibly support a gross negligence claim for breach of contract.

Ambac argues correctly that, under certain circumstances, New York law "will not require strict compliance with a contractual notice-and-cure provision," Giuffre Hyundai, Ltd. v. Hyundai Motor Am., 756 F.3d 204, 209 (2d Cir. 2014). But Ambac fails to demonstrate how BNYM's decision not to take such an aggressive action as declaration, contrary to the plain

language of the Resolution, of an immediate non-monetary default on the theory that the breach

was incurable was grossly negligent.  Indeed, the Resolution's text expressly disclaimed any

duty for BNYM to do so.  (Resolution § 802 ("The Trustee undertakes to perform such duties

and only such duties as are specifically set forth in this Resolution, and no implied covenants or

obligations shall be read into this Resolution against the Trustee.").)  Instead, Ambac offers only

a conclusory assertion that BNYM's conduct was "reckless" because the Compliance Law "had

already irreparably shattered confidence in [COFINA's] structure."  (Pl. Mem. at 41.)  Such an

assertion cannot plausibly demonstrate that BNYM's fidelity to the Resolution's plain text was

grossly negligent.

        Ambac has failed to plead facts that could plausibly support a claim that BNYM

violated its duties under the Resolution in a grossly negligent manner.  Ambac's claim for

grossly negligent breach of the Resolution is thus dismissed.

Count Two - Breach of Pre-Default Common Law Duties

        Ambac alleges that BNYM was grossly negligent in failing to avoid conflicts of

interest "that infected its decisions throughout the events at issue."  (Pl. Mem. at 35.)

Specifically, Ambac alleges that BNYM was conflicted in three ways: (i) it had "pervasive

business relationships with the Commonwealth . . . that would be imperiled by declaring an

[EOD];" (ii) it "acted as trustee for multiple classes of COFINA bondholders, whose interests

diverged sharply once default became imminent;" and (iii) it "had substantial business

relationships with Subordinate Bondholders," which would have been jeopardized by "a prompt

declaration of default."  (Id. at 35-36.)

"Prior to an event of default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: a trustee must (1) avoid conflicts of interest, and (2) perform all basic, non-discretionary, ministerial tasks with due care." Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 191-92 (S.D.N.Y. 2011). "Those two pre-default obligations are not construed as 'fiduciary duties,' but as obligations whose breach may subject the trustee to 'tort liability.'" Id. (quoting AG Cap. Funding Partners, L.P. v. State St. Bank & Tr. Co., 11 N.Y.3d 146, 156 (2008)).

Ambac's claim that BNYM's "pervasive business relationships with the Commonwealth and other Puerto Rico entities" constituted a conflict of interest fails because such relationships cannot, on their own, demonstrate a disqualifying conflict of interest, let alone grossly negligent breach of BNYM's duty to avoid the same. (Pl. Mem. at 44 (citing SAC ¶¶ 44-47).) "The existence of a conflict of interest cannot be inferred solely from a relationship between an issuer and an indenture trustee that is mutually beneficial and increasingly lucrative." Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n, 109 F. Supp. 3d 587, 598 (S.D.N.Y. 2015) (internal quotation marks and citation omitted). Nor does "[t]he mere fact that an indenture trustee does repeat business with an entity . . . create a conflict of interest." Id. at 610. Such "bald assertions of conflict" are not sufficient; a plaintiff must show that a trustee "personally benefitted" from the alleged misconduct. Elliot Assocs. v. J. Henry Schroder Bank & Tr. Co., 838 F.2d 66, 73 (2d Cir. 1988) (no conflict of interest shown where trustee derived no personal benefit from failure to take discretionary course that would have maximized returns for bondholders).

A claim for failure to avoid conflicts of interest may be asserted against a trustee if the plaintiff "alleges a defendant's complicity in a 'quid pro quo system.'" BlackRock

Allocation Target Shares v. Wells Fargo Bank, Nat'l Ass'n, 247 F. Supp. 3d 377, 397 (S.D.N.Y. 2017).  "Several courts in this district have recently held that allegations of this type of 'quid pro quo system where [the trustee] turns a blind eye to breaches of [an indenture] in the hopes that counterparties would later "return a favor" if true, would demonstrate that the Defendant "received a[ ] benefit from its decision" not to act on the breaches of R&Ws, constituting a conflict of interest.'"  Royal Park Invs. SA/NV v. Bank of N.Y. Mellon, No. 14-CV-6502-GHW, 2016 WL 899320, at *7 (S.D.N.Y. Mar. 2, 2016) (citation omitted).  Royal Park and similar cases relied upon by Ambac, which involved "quid pro quo system[s]" among institutions serving in multiple capacities in connection with residential mortgage-backed securities, are not instructive here, where there is no allegation that BNYM, in failing to declare events of default, did so to benefit itself in a separate business relationship with a counterparty to the transaction or to avoid revelation of its own potential liability in connection with such a separate business relationship.

        In the cited line of cases, the quid pro quo involved a trustee that also maintained a loan servicing business turning a blind eye to breaches by a servicer that also, separately, operated as a trustee.  Under such a scheme, the alleged quid pro quo was that, if one trustee turned a blind eye to breaches by a servicer, that servicer (later serving as a trustee) would then, in turn, ignore future breaches by the trustee (as a servicer).  See, e.g., Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co., 172 F. Supp. 3d 700, 710 (S.D.N.Y. 2016) (finding claim stated where plaintiff alleged that Deutsche Bank "did not take action [as trustee] to protect the Trusts because it was engaged in the same servicing misconduct in its role as a sponsor, originator and servicer for other mortgages and RMBS trusts."); see also BlackRock, 247 F. Supp. 3d at 397 (finding sufficient allegation that trustee "refused to act against sellers and servicers 'because

doing so would have exposed [the trustee's] own misconduct as a [s]eller or [s]ervicer for other RMBS trusts in which these same entities served as either trustee or servicer'" (citation omitted)).  Here, Ambac alleges only that BNYM did not want to jeopardize future business with the Commonwealth and its instrumentalities.  Ambac does not allege an actionable quid pro quo, but only a "mutually beneficial and increasingly lucrative business relationship" insufficient to support a claim for breach of a trustee's duty to avoid conflicts of interest.  Royal Park, 109 F. Supp. 3d at 598 (internal quotation marks and citation omitted).

Furthermore, even if BNYM's trustee and other unspecified financial arrangements with Commonwealth entities and holders of Subordinated Bonds could be construed as presenting conflicts of interest, Ambac's claim that any related pre-EOD duty was breached in a grossly negligent manner fails to state a claim because Ambac has not identified any aggravating factor that elevates BNYM's conduct from ordinary negligence to gross negligence.  Ambac argues that BNYM "acted as trustee for multiple classes of COFINA bondholders whose interests diverged sharply once a default became imminent.  Senior Bondholders wanted BNYM to declare an event of default and accelerate their bonds as soon as possible; Subordinate Bondholders wanted BNYM to hold off.  Those interests were irreconcilable."  (Pl. Mem. at 36 (internal citations omitted).)  A trustee can commit a breach of trust by failing to take action to extricate itself from a conflict, even if the trustee was not at fault for the conflict's emergence.  See, e.g., N.Y., N.H. & H.R. Co. v. Iannotti, 567 F.2d 166, 179 (2d Cir. 1977) (finding that a trustee "did not commit a breach of trust by simply finding itself between conflicting interests when the [debtor] filed for reorganization.  If there was a breach at all, it would have occurred when [the trustee] failed to extricate itself from the conflict").  Taking Ambac's allegations as true, BNYM may have potentially acted negligently in failing to extricate

itself from a conflict between the interests of senior and subordinate bondholders.  But Ambac again fails to plead any facts supportive of the notion that Ambac's omission was of an aggravated character.  See Tevdorachvili v. Chase Manhattan Bank, 103 F. Supp. 2d 632, 644 (E.D.N.Y. 2000) ("The difference between negligence and gross negligence is one of fact, not law, and plaintiff alleges no facts to sustain a cause of action for gross negligence." (internal quotation marks and citations omitted)).  Ambac argues that BNYM could have appointed a co-trustee under the Resolution's terms but fails to demonstrate that BNYM was grossly negligent for failing to do so.  (Pl. Mem. at 38.)  The Resolution required parity of treatment of bondholder rights prior to an EOD and, as discussed above, Ambac has not alleged conduct plausibly constituting gross negligence in BNYM's interpretation of the covenants, notice and default provisions of the Resolution.  Even if Ambac is correct that BNYM should have appointed a co-trustee to extricate itself from the conflicting interests of the bondholder classes, it proffers no facts from which a reasonable fact finder could conclude that BNYM's failure to do so was an extreme departure from the ordinary standard of care in such situations.

As to the Subordinate Bondholders, Ambac's bare allegation of "significant business relationships" is insufficient to support a claim for breach of the duty to avoid conflicts, let alone grossly negligent breach of the same.  See Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd., 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013) ("A party acting in their own economic self-interest is not enough to constitute gross negligence or willful misconduct.").

For these reasons, Ambac fails to state a claim for gross negligent breach of pre-default duties at common law, and this claim is dismissed.

Count Three - Breach of Post-Default Common Law Duties

       Ambac alleges that BNYM breached its post-default fiduciary duty of undivided loyalty in a grossly negligent manner, by: (i) failing to remedy conflicts of interest; (ii) failing to give notice of EODs as they occurred or to recognize EODs on the basis of notices issued by Bondholders or Ambac; (iii) failing to cease payments to Subordinate Cash Pay Bondholders following EODs; (iv) failing to accelerate the Senior Bonds; (v) failing in general to act in the best interest of Ambac or protect the interests of holders of Senior Bonds; and (vi) "otherwise exercising its discretion arbitrarily and in bad faith."  (SAC ¶ 162.)

       After an EOD has occurred, an indenture trustee's duties "more closely resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture."  Millenium Partners, L.P. v. U.S. Bank Nat'l Ass'n, No. 12-CV-7581-HB, 2013 WL 1655990, at *3 (S.D.N.Y. Apr. 17, 2013) (internal alterations, quotations, and citation omitted).  "[F]ollowing an Event of Default, a trustee takes on a special duty to secure the assets of the trust and act with undivided loyalty to trust beneficiaries."  Blackrock Core Bond Portfolio v. U.S. Bank Nat'l Ass'n, 165 F. Supp. 3d 80, 105 (S.D.N.Y. 2016) (citing Beck v. Mfr. Hanover Tr. Co., 218 A.D.2d 1 (1995)).

       As explained above, Ambac has neither shown that BNYM's interpretation of the contractual notice and default provisions was grossly negligent nor that BNYM acted under a conflict of interest that raised its duties above due care.  To the extent its claim of conflict is plausible, Ambac has in any event failed to proffer facts plausibly supporting an inference that BNYM breached any resulting duty in a grossly negligent manner.  Count III fails to state a claim for the same reasons — Ambac has not pleaded plausibly that (even if there was a ripened

EOD) BNYM acted in a manner that rose to the level of a grossly negligent breach of any resulting heightened duty.

Count Four - Breach of the Implied Covenant of Good Faith and Fair Dealing

Finally, Ambac's claim for breach of the implied covenant of good faith and fair dealing fails because that covenant is expressly disclaimed in the Resolution. "Every contract is assumed to incorporate a covenant of good faith and fair dealing unless such obligation is expressly disclaimed." Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n, No. 14-CV-10116-KBF, 2016 WL 1169515, at *10 (S.D.N.Y. Mar. 22, 2016). Under New York law, the implied covenant of good faith and fair dealing is disclaimed effectively where an agreement provides that "no implied covenants or obligations shall be read into this Agreement[.]" See, e.g., Fixed Income Shares: Series M v. Citibank, N.A., 157 A.D.3d 541, 542 (N.Y. App. Div., 1st Dep't, 2018); Commerzbank AG v. U.S. Bank Nat'l Ass'n, 277 F. Supp. 3d 483, 498 (S.D.N.Y. 2017) rev'd in part on other grounds 100 F.4th 362 (2d Cir. 2024). Moreover, "a court cannot imply a covenant inconsistent with terms expressly set forth in the contract . . . . Nor can a court imply a covenant to supply additional terms for which the parties did not bargain." Banco Espanol de Credito v. Sec. Pac. Nat'l Bank, 763 F. Supp. 36, 44 (S.D.N.Y. 1991), aff'd, 973 F.2d 51 (2d Cir. 1992) (omission in original) (quoting Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 991 (S.D.N.Y. 1989)).

The implied covenant of good faith and fair dealing was expressly disclaimed in the Resolution. (See Resolution § 802 ("[N]o implied covenants or obligations shall be read into this Resolution against the Trustee.").) Furthermore, to the extent that the Resolution does not effectively disclaim the implied covenant, Ambac's claims regarding this duty are duplicative of

its claim for grossly negligent breach of contract.  See Commerzbank, 277 F. Supp. 3d at 498

(dismissing a claim under the implied covenant of good faith and fair dealing where the

allegations "stem[] from the same facts as the breach of contract claim"); see also IKB Int'l, S.A.

v. Wells Fargo Bank, N.A., 40 N.Y.3d 277, 290-91 (2023) ("A simple breach of contract is not

to be considered a tort unless a legal duty independent of the contract itself has been violated."

(internal citation omitted)).  Finally, even if the implied covenant had not been disclaimed

effectively, and even if Ambac's claims are not duplicative of its claims for grossly negligent

breach of contract, Count IV fails to state a claim upon which relief may be granted because, as

explained above, Ambac has not alleged plausibly that BNYM acted in a grossly negligent

manner.

CONCLUSION

For the foregoing reasons, BNYM's motion to dismiss the SAC is granted in its

entirety.  The COFINA Confirmation Order preserved only Ambac's relevant ability to make

claims premised on gross negligence, and Ambac has failed entirely to state such a claim upon

which relief may be granted.  This Memorandum Opinion and Order resolves Docket Entry No.

36.  The Clerk of Court is respectfully directed to enter judgment in Defendant's favor and close

this case.

SO ORDERED.

Dated: New York, New York
         September 24, 2024

                                                    /s/ Laura Taylor Swain
                                                    LAURA TAYLOR SWAIN
                                                    United States District Judge